[Civ. Nos. 51526, 51527, Second Dist., Div. Four, Mar. 21, 1979.]

CITY OF LOS ANGELES, Plaintiff, Cross-Defendant and Appellant, v. ROBERT A. WALLER et al., Defendants, Cross-complainants and Appellants.

COUNSEL

Burt Pines, City Attorney, Lawrence M. Nagin, Assistant City Attorney, and James L. Spitser, Deputy City Attorney, for Plaintiff, Cross-defendant and Appellant.

Fadem, Berger & Norton, Gregory M. Bergman and Michael M. Berger for Defendants, Cross-complainants and Appellants.

OPINION

JEFFERSON (Bernard), J.—Plaintiff City of Los Angeles brought an action for condemnation against defendants Robert A. and Judy T. Waller, Edward W. and Irene M. Gibb, David E. and Bernice Bradley, Lew E. and Joanne Coppersmith, Hilja M. Smythe, and Robert P. and Jean L. Andrews. The defendants brought an action for inverse condemnation against the City of Los Angeles. The cases were consolidated for trial, as both concerned the subject property, consisting of approximately 35 acres located in Palmdale, California, near the airport.

A bifurcated trial was held. The legal issues were tried first before the court, and resulted in findings of fact and conclusions of law. Subsequently there was an exchange of final offers and demands pursuant to Code of Civil Procedure section 1249.3.[1] Trial by jury on the issues of fair market value and damages followed.

The jury arrived at various verdicts, awarding the Andrews defendants $47,700 for their parcel of about five acres, but no amount for so-called "delay damages";[2] the remaining owner defendants (the Waller group) were awarded $333,600 for their parcel A, but no amount for "delay damages" and $6,000 for parcel B. Judgment was entered accordingly.

Defendants moved for a new trial; their motion was denied. Defendants filed a memorandum of costs and disbursements. Plaintiff moved to tax costs. Defendants moved for an award of litigation costs, pursuant to

---

[1] Repealed by Statutes 1975, chapter 1275, section 1, page 3409. Now Code of Civil Procedure section 1250.410 (Stats. 1975, ch. 1275, § 2, p. 3432).

[2] As set forth in *Klopping* v. *City of Whittier* (1972) 8 Cal.3d 39 [104 Cal.Rptr. 1, 500 P.2d 1345].

Code of Civil Procedure section 1246.3.[3] Plaintiff's motion to tax costs was granted and defendants' motion for an award of litigation costs was denied. Defendants moved for reconsideration of the denial; the trial court then awarded defendants $2,000 in attorney fees as to the Waller Parcel B, but denied all other claims made for costs, disbursements and litigation fees. Defendants filed a motion for an award of expenses pursuant to Code of Civil Procedure section 2034, subdivision (c); the motion was denied.

Defendants have appealed from the judgment in condemnation. They have also filed a subsequent and separate appeal from all of the postjudgment orders denying their postjudgment motions, i.e., the motions for a new trial, for costs and disbursements, for litigation costs pursuant to Code of Civil Procedure section 1246.3, and for the award of expenses pursuant to Code of Civil Procedure section 2034, subdivision (c). Defendants also challenge the sufficiency of the trial court's award of $2,000 in attorney fees with respect to the Waller Parcel B.[4]

Plaintiff city has appealed from the postjudgment order awarding defendant owners attorney fees of $2,000 with respect to the Waller Parcel B.

I

*The Factual and Procedural Backgrounds*

The subject property consists of 35 acres of vacant, undeveloped land in Palmdale, situated along P Street, across which lies the entry to Air Force Plant 42, an airport referred to as The Palmdale Joint Use United States Airport because it is sometimes used by both the City of Palmdale and the federal government. Air Force Plant 42 is also the site of some commercial installations engaged in military and aerospace production. The Andrews couple acquired five acres in 1959, for future development; that parcel is contiguous with the larger acreage acquired by the Waller group in 1967.

On August 21, 1968, the City of Los Angeles Board of Airport Commissioners passed a resolution to condemn some 17,000 acres, the

[3]Now Code of Civil Procedure section 1036. (Added by Stats. 1975, ch. 1240, § 8, p. 3164.)

[4]An appeal may be taken from orders made after a judgment if the judgment is made appealable by Code of Civil Procedure section 904.1, subdivision (a). (Code Civ. Proc., § 904.1, subd. (b).)

amount estimated to be necessary for the proposed Palmdale Intercontinental Airport. A part of the required acreage was the subject property owned by the Andrews and the Waller group. It was contemplated that the new airport would be operational between 1976 and 1978. On February 4, 1969, the Los Angeles City Council adopted an ordinance authorizing condemnation of the subject property; negotiations concerning acquisition commenced.

In November 1970, however, the City of Los Angeles announced that certain land, including the subject property, was to be excluded from the acquisition of acreage for the airport. In reliance upon this development, the Waller group donated two and one-half acres (referred to herein as Waller Parcel B) to Los Angeles County for the widening of P Street and the creation of a new street, 20th Street East.

However, on September 1, 1972, the city filed a complaint in eminent domain against the defendant owners, recorded a lis pendens, but did not serve the defendants at that time. In 1973, the city changed its plan and resumed steps to acquire the Andrews and Waller properties. The city offered to purchase the property in 1973, but the offer was not accepted. The Andrews defendants were finally served on June 24, 1974. The Wallers were never formally served but all defendant owners finally answered the complaints. The cross-complaints for inverse condemnation were filed December 5, 1974, seeking "delay damages" for the taking, and also alleging a de facto taking.

The findings of fact and conclusions of law, made by the trial court after the trial of the legal issues, included the determination that "Waller intended to use his property for commercial development to take advantage of its proximity to the entry of Air Force Plant 42, . . . Mr. and Mrs. Andrews purchased [the property] and held the same for future development." The court also found that "[i]n early 1969 the City solicited and received the aid of the County of Los Angeles in withholding approval of any action by any Owner of property within the boundaries of the proposed Intercontinental Airport." The findings were as follows: "Owners were, from July 1969 until November 1970, prevented from making any use of their land. . . . [¶] [16] Owners, from September 1, 1972 until now have been prevented from selling or leasing their land for a price approaching its market value, or from borrowing upon its security. [¶] [17] *The City has unreasonably delayed* in the institution and prosecution of the condemnation of the Subject Property.

[18] The inclusive dates of City's unreasonable delay are between November 18, 1970 and June 10, 1974." (Italics added.)

The court also found that the Wallers had placed reasonable reliance upon the city's expressed intention to exclude them from the airport project when they donated parcel B to the County of Los Angeles.

As a conclusion of law the trial court found that "[a]ny property enhancement in the Andrews Property and Parcel A of the Waller property occurring between November 18, 1970 [the date of exclusion], and March 23, 1973 [the date of reinclusion], may be considered in the valuation phase of this trial." The trial court, however, rejected the contention that the city's actions with respect to the subject properties had constituted a de facto taking of such properties except for the Waller Parcel B.

For purposes of valuation—and just compensation—the effective date was determined to be that of date of trial for parcel A (Waller) and Andrews, and May 1971 for parcel B (Waller).

The trial court also concluded: "Owners are entitled to be compensated for damages caused by the City's unreasonable delay and oppression in instituting and prosecuting the condemnation action and violation of Government Code § 7267 et seq.[5] for the period from November 1972 through June 10, 1974." Another conclusion of law stated: "In the valuation phase of the trial to establish such damages the jury may consider the rate of interest during the period of unreasonable delay."

Trial by jury was held from March 23, 1976, to April 9, 1976. Much of the evidence presented consisted of the testimony of plaintiff city's appraiser Mason and of defendant owners' appraiser Beeney. The valuations of the two appraisers were widely divergent, including those made for "delay damages." As to the Andrews parcel, Mason valued it at $37,500 and found no "delay damages"; Beeney valued it at $107,000 with $16,000 "delay damages." As to the Waller Parcel A, Mason valued it at $255,000 with no "delay damages"; Beeney thought it worth $720,000 with $102,000 "delay damages." Parcel B was given a nominal value of $1 by Mason, while Beeney assigned a value of $28,000.

---

[5]Added by Statutes 1971, chapter 1574, section 10, page 3160. Government Code section 7267 and succeeding sections establish guidelines for public entities engaging in condemnation activities, "to promote public confidence in public land acquisition practices." Among the guidelines is a preference for negotiation rather than suit, if possible. No sanctions are specified for violation of these provisions by a public entity.

The jury arrived at figures substantially closer to those offered by the city's appraiser Mason than to those of Beeney, and awarded nothing by way of "delay damages." These appeals followed.

## II

### Defendant Owners' Appeal

Defendants challenge the testimony of city appraiser Mason, arguing that subsequent developments—developments after trial—cast doubt upon his credibility and that his appraisals were arrived at by improper methods.

The circumstances of the credibility dispute were as follows: Mason testified at trial that the fair market value of the Waller Parcel A was $9,303 per acre; he was pessimistic about the economic future of the Palmdale area, and particularly pessimistic about the value of property around the airport, including the subject property. He was cross-examined at length.

At approximately the same time that Mason was testifying in this case, his appraisal report in another condemnation action had been received by Attorney McLaurin, in April 1976. That report concerned the Warnack property, located next to the Waller property on P Street and also consisting of vacant undeveloped land. The Warnack property involved substantially less total acreage, but Mason, as the result of his appraisal as of the same approximate date, had valued Warnack at $15,000 per acre, some $6,000 more per acre than the value he had assigned to Waller.

After the instant trial had concluded, defendants obtained a copy of the Warnack property appraisal report. This document was attached as an exhibit to defendants' memorandum of points and authorities in support of their motion for a new trial; it was defendants' opinion that the Mason appraisal in the Warnack action was more accurate than his appraisal in the instant case, and reflected his recognition that he had made a mistake in the Waller appraisal which he sought to correct in Warnack. A lack of credibility on the part of Mason was assigned by defendants as a compelling reason for their entitlement to a new trial.

■ In opposing defendants' motion for new trial, plaintiff pointed out that there was no declaration offered by defendants regarding the matter of whether Mason had offered testimony in the Warnack action that was

either consistent with the appraisal report or inconsistent therewith, or whether the report became an exhibit in the Warnack action. But plaintiff did not dispute the fact that Mason had executed an appraisal report as set forth in the exhibit attached to the defendants' memorandum in support of the motion for a new trial. Defendants' memorandum can be interpreted as a request for the trial court to take judicial notice of Mason's Warnack appraisal report. The trial court's remarks during the argument of the motion for new trial indicate that he accepted the exhibit as being accurate and true, the genuineness of the report not really being contested by plaintiff—only the use made of the report in the Warnack action. Under these circumstances, we conclude that the trial judge properly took judicial notice of Mason's Warnack appraisal report as being a genuine document. (Evid. Code, § 452, subd. (g).)[6]

But the genuineness of Mason's Warnack appraisal report casts no definitive light on the matter of Mason's credibility as a witness in the instant case. Thus, it was stated in *City of San Jose* v. *Superior Court* (1974) 12 Cal.3d 447, 461-462 [115 Cal.Rptr. 797, 525 P.2d 701, 76 A.L.R.3d 1223], in the context of a class action matter, that "the fundamental maxim [is] that each parcel of land is unique. [Citations.] Although this rule was created at common law, the very factors giving it vitality in the simple days of its genesis take on added significance in this modern era of development. Simply stated, there are now more characteristics and criteria by which each piece of land differs from every other." This observation is relevant here: we cannot know the factors involved in arriving at the Warnack figure which might reasonably have justified the substantially higher appraisal from the same appraiser. The appraisal was not arrived at through application of scientific method, but was presumably the best educated opinion that a duly qualified expert could provide.

■ The Warnack appraisal by Mason had no relevance in determining whether Mason's Waller appraisal should have been the same as the Warnack appraisal; nor would it have been admissible at the Waller trial as proof of valuation of the Waller properties. Section 822 of the Evidence Code declares that certain evidence is inadmissible as evidence

---

[6]Evidence Code section 452, subdivision (g), provides that judicial notice may be taken of "[f]acts and propositions that are of such common knowledge within the territorial jurisdiction of the court that they cannot reasonably be the subject of dispute." Since there was no showing that Mason's Warnack appraisal report became a part of the record of the Warnack action, its *existence* did not become subject to judicial notice under Evidence Code section 452, subdivision (d), which provides for judicial notice of "[r]ecords of (1) any court of this state . . . ."

of value in condemnation proceedings, including "[a]n opinion as to the value of any property or interest other than that being valued."

However, it has been held that section 822 does not preclude the use of an unrelated appraisal "to impeach the credibility of the expert valuation witness." (*State of Cal.* ex rel. *State Pub. Wks. Bd.* v. *Stevenson* (1970) 5 Cal.App.3d 60, 65 [84 Cal.Rptr. 742].) Thus, the Warnack appraisal could have been utilized by defendants at trial as an impeachment source to attack Mason's opinion of value, had they known of its existence.

■ Defendants did not specify any particular basis for their motion for new trial, i.e., one of those enumerated grounds set forth in Code of Civil Procedure section 657. Their argument below, however, made it clear that they were either relying on "[n]ewly discovered evidence, material for the party making the application, which he could not, with reasonable diligence, have discovered and produced at the trial" (subd. 4) or "[i]nsufficiency of the evidence to justify the verdict or other decision, or that the verdict or other decision is against law" (subd. 6). But neither ground is supported by the record. We cannot tell if appropriate discovery would have alerted defendants to the possibility of a conflicting appraisal; the record is devoid of explanation of "reasonable diligence" facts, a prerequisite to the successful invocation of "newly discovered evidence" as grounds for a new trial. And, the fact that there was a potential source of impeachment material does not render the testimony of a witness insufficient to support a verdict. Inconsistencies in a witness' testimony do not preclude a jury from giving whatever weight it desires to the testimony. Under these circumstances, we cannot say that Mason's Warnack appraisal compelled the granting of defendants' motion for a new trial.

■ Defendants further contend that the Mason appraisal testimony was tainted by Mason's failure to follow the valuation principles concerning "project enhancement" set forth in *Merced Irrigation Dist.* v. *Woolstenhulme* (1971) 4 Cal.3d 478 [93 Cal.Rptr. 833, 483 P.2d 1]. It was held therein that increased value of land due to a proposed public improvement could, under certain circumstances, be recognized in the valuation process. The *Woolstenhulme* court declared that "increases in value, attributable to a project but reflecting a reasonable expectation that property will not be taken for the improvement, should properly be considered in determining 'just compensation.' " (*Id.,* at p. 495.) The recent case of *City of Los Angeles* v. *Retlaw Enterprises, Inc.* (1976) 16 Cal.3d 473 [128 Cal.Rptr. 436, 546 P.2d 1380], reiterates the guidelines of

"project enhancement" and emphasizes the necessity for appropriate jury instructions in this regard; no complaint is made that the jury in the instant case was not properly instructed about "project enhancement."

Defendants have cited various portions of the reporter's transcript as indicative of Mason's refusal to include project enhanced comparable sales in his analysis which led to the valuation of the subject property. We have examined Mason's testimony with some particularity but find no clear-cut evidence that Mason did in fact exclude such comparable sales. Much of the testimony was prolix and not terribly clear, but it appears that Mason understood the procedures outlined in *Woolstenhulme* and *Retlaw*. In addition, the record indicates that particular sales were relied upon by Mason which included project enhanced values. Defendants' grievance appears to be that Mason did not sufficiently emphasize this element in his analysis—a matter appropriately resolved by cross-examination at trial. As the record demonstrates, we deem the evidence sufficient to support the jury verdicts.

Defendants contend that the record compels the legal conclusion that plaintiff city, by its precondemnation activities, made a de facto taking of defendants' properties before actual condemnation commenced. This contention was rejected by the trial court at the conclusion of the "legal issues" phase of the proceedings below, but we are referred to certain findings of fact and conclusions of law which refer to such a "taking," as it is defined in the decisional law.

Those findings recite that from September 1, 1972, when suit was filed and the lis pendens obtained, defendants were prevented from using their property, "from selling or leasing their land for a price approaching its market value, or from borrowing upon its security." As a consequence, defendants claim that a "de facto" taking occurred, and that this circumstance entitled them not only to the fair market value of the property as of the time of taking, but to prejudgment interest and the "carrying costs" of the property to the time the condemnation judgment was entered.

"In de facto taking cases, the landowner claims that because of particularly *oppressive* acts by the public authority the 'taking' actually has occurred earlier than the date set by statute. (Code Civ. Proc., § 1249.) [Citation.] The prevailing rule, . . . is that before a de facto taking results there must be a 'physical invasion or direct legal re-straint. . . .' " (*Klopping, supra*, 8 Cal.3d 39, 46.) (Italics added.) And in

*Richmond Elks Hall Assn.* v. *Richmond Redevelopment* (9th Cir. 1977) 561 F.2d 1327, a case in which a de facto taking was established by dilatoriness on the part of the public entity which resulted in the loss of commercial tenants and physical damage to the property, it was said that "[w]hen a public entity acting in furtherance of a public project *directly and substantially* interferes with property rights and thereby *significantly* impairs the value of the property, the result is a taking in the constitutional sense and compensation must be paid." (*Id.,* at p. 1330.) (Italics added.)

■ We perceive in eminent domain cases—or "just compensation" cases—various degrees of culpability on the part of the public entity which entitle condemnees to an escalating amount of relief, depending upon the determination of the degree. Unusually oppressive conduct results in a determination of "de facto taking" while *delay* is answerable in proximately caused damages. What constitutes oppression, or direct and substantial impairment of property rights by the condemner, is essentially a factual question, one determinable on a case-by-case basis. In the case at bench, the trial court concluded that a de facto taking had not been established, although there was unreasonable delay which could be considered by the jury during the valuation phase of the proceedings.

We agree with the trial court, particularly in view of the fact that there was substantial testimony that the subject property's highest and best use was as an investment, to be`held until such time as its value had increased. Defendants did not demonstrate that the conduct of the condemner defeated this highest and best use, nor was it demonstrated that the condemner substantially impaired defendants' property rights. A recent case, *Jones* v. *People* ex rel. *Dept. of Transportation* (1978) 22 Cal.3d 144 [148 Cal.Rptr. 640, 583 P.2d 165], affirmed a judgment for *damages* because the public entity destroyed—temporarily at least—access to the subject property, a far more extreme situation than that presented here. The contrast persuades us that no de facto taking occurred in the case before us.

Defendants next argue that the jury's failure to award any damages whatsoever for plaintiff city's unreasonable delay in instituting condemnation proceedings was "unconstitutional" and requires a reversal of the judgment.

Both plaintiff and defendants offer differing interpretations of the scope of *Klopping,* which held that "a condemnee must be provided with an opportunity to demonstrate that (1) the public authority acted

improperly either by unreasonably delaying eminent domain action following an announcement of intent to condemn or by other unreasonable conduct prior to condemnation; and ▬ as a result of such action the property in question suffered a diminution in market value." (*Klopping, supra,* 8 Cal.3d 39, 52.) In *Klopping,* the loss of rental income was described as an "appropriate criterion for measuring fair market value." (*Id.,* at p. 53.) Plaintiff city would limit the holding to only those cases where loss of rental income was established, while defendants urge a greatly expanded application of the *Klopping* principle. We perceive that *Klopping* is not necessarily subject to the narrow construction contended for by plaintiff city but pertains to concepts which must be developed and refined on a case-by-case basis.

We take note of two cases in the Courts of Appeal which have considered the issue of what constitutes sufficient evidence to support an award of so-called *Klopping* "delay damages."

In *Stone* v. *City of Los Angeles* (1975) 51 Cal.App.3d 987, 994-995 [124 Cal.Rptr. 822], "delay damages" were approved on the basis of persuasive evidence that the plaintiffs had lost actual rental income from their property due to condemnation delay. On the other hand, in *City of Los Angeles* v. *Lowensohn* (1976) 54 Cal.App.3d 625 [127 Cal.Rptr. 417], the trial judge took the issue of "delay damages" from the jury because the evidence established that the owner of the subject property had never made any productive use of the property but was merely holding it as an investment. The *Lowensohn* court affirmed the trial court action, observing that "[t]here is no recovery via condemnation for the taking of a pipe dream." (*Id.,* at p. 636.)

▬ In our view, the evidence in the case at bench more nearly resembles that presented in *Lowensohn* rather than that presented in *Stone,* and the jury so found. Despite the testimony of certain of the owner defendants as to plans once held for development of the property, the jury was apparently convinced that the real objective was to hold the property for speculative purposes. There were conflicting inferences in the testimony, and the jury, as the trier of fact, had to choose which inferences it found more reasonable. Unless the result is such as to shock the conscience of a reviewing court, the result must stand.

Under the circumstances presented here, we do not feel compelled to reverse the jury verdict that no "delay damages" were actually incurred where vacant land simply remained in that condition until condemnation

finally occurred. Since we affirm the jury verdict, it is unnecessary to address the issues involved in defendants' claims of entitlement to interest and "carrying costs" such as taxes paid throughout the delay period.

Defendants stress the fact that the trial court specifically found plaintiff city in violation of Government Code section 7267 et seq. As we explained in footnote 5, *ante,* those sections do not inform us as to the scope, if any, of a cause of action based upon violation of those sections; no remedies are mentioned in the statutory scheme. If such remedies are to be recognized, their parameters await an appropriate case.

Defendants also seek review of certain discretionary rulings of the trial court concerning attorney fees awarded defendants with respect to the Waller Parcel B (pursuant to Code Civ. Proc., § 1036, formerly Code Civ. Proc., § 1246.3) and the denial of "expenses" claimed by defendants pursuant to Code of Civil Procedure section 2034, subdivision (c).

■ The trial court awarded defendants $2,000 in attorney fees for the Waller Parcel B, having determined that there was a "taking" of that property. Section 1036 authorizes such an award in an inverse condemnation action under such circumstances. Defendants claim that the award was inadequate. Since the statute specifies that the award shall be made in a sum which, "in the opinion of the court," will reimburse a successful litigant, it follows that the court has considerable discretion in determining the amount; our review is limited to deciding whether an abuse of discretion has occurred. We find none here. The litigation costs incurred to establish the donation to the County of Los Angeles of two and one-half acres for road purposes were minimal.

■ Defendants also assert that, pursuant to Code of Civil Procedure section 2034, subdivision (c), they are entitled to substantial litigation expenses incurred as a result of an allegedly evasive answer by plaintiff city to a request for admissions. We note that (1) it is far from clear that the city was being deliberately dishonest and (2) that this matter was before the trial court and its resolution, like most discovery matters, was within the broad discretion of that court. (*Hillman* v. *Stults* (1968) 263 Cal.App.2d 848, 889 [70 Cal.Rptr. 295].) We find no abuse of discretion.

## III

### *Plaintiff City's Appeal*

■ Plaintiff city cross-appeals from the judgment in condemnation and also appeals from the order awarding $2,000 in attorney fees against

it with respect to the Waller Parcel B. Plaintiff city asserts that there was no taking by the city because the land was not donated to the City of Los Angeles but to the County of Los Angeles, and that such awards of fees can only be made, pursuant to the statute, in inverse condemnation proceedings. Neither of these grounds is meritorious. The trial court found that the Waller defendants had made the donation in reliance upon the city's expressed intention to exclude the Waller property from the airport project. It was this reliance that proximately caused the taking of the land. In addition, this was a consolidated action involving issues of both direct and inverse condemnation. We hold that Code of Civil Procedure section 1036 clearly applies. Plaintiff city's appeals are without merit.

The judgment and orders are affirmed.

Files, P. J., and Kingsley, J., concurred.

A petition for a rehearing was denied April 10, 1979, and the petition of the defendants, cross-complainants and appellants for a hearing by the Supreme Court was denied June 14, 1979.